STATE OF NORTH CAROLINA v. JAMES ALTON (BUCK) GRADY

No. 7814SC323

(Filed 3 October 1978)

1. **Constitutional Law § 30— false testimony at first trial—no prejudice on retrial**

   There was no merit to defendant's contention upon retrial in a homicide prosecution that he was denied due process when a witness to the crime was allowed to testify for the State at the first trial, contrary to true facts known to a detective and the district attorney, that he did not have a gun on the night of the crime, since the false testimony, regardless of whether corrected, was at a former trial and did not prejudice defendant because he was afforded a new trial on other grounds; furthermore, there was overwhelming uncontradicted testimony that the decedent had no gun and that defendant had been wounded in an exchange of fire occurring after the witness struggled with defendant and took away defendant's gun.

2. **Constitutional Law § 30— bullet removed from defendant lost—no denial of material evidence**

   In view of the unequivocal and unimpeached testimony of a ballistics expert that the marks on a bullet taken from defendant's back were compatible with marks left by the type gun belonging to defendant and in view of the un-

State v. Grady

contradicted testimony that the decedent had no gun, defendant in a homicide prosecution failed to show how the unavailability of the lost bullet which had been taken from his back denied him material evidence essential to his defense.

3. **Criminal Law § 57— bullet removed from defendant—type of weapon involved —expert opinion evidence admissible**

   The trial court in a homicide prosecution did not err in allowing a ballistics expert to testify that a lost bullet which had been removed from defendant's back could not have been fired from any Colt .38 caliber weapon, the kind of gun found in an eyewitness's car, since the witness expressed an opinion based on knowledge within his sphere of expertise and in response to a properly phrased hypothetical question.

4. **Criminal Law § 53— homicide—deceased's inability to use hand—expert opinion evidence admissible**

   In a homicide prosecution where defendant contended that deceased began the altercation in question by slapping defendant, opening his car door and attempting to pull defendant out of his car by his pants leg, the trial court did not err in allowing a doctor who had treated deceased twenty-four years earlier to testify concerning deceased's complete inability to use his right hand to accomplish any of the acts alleged by defendant, and the lapse of time from the doctor's treatment of deceased to the time of the alleged crime went to the weight to be accorded the doctor's opinion, not its admissibility.

APPEAL by defendant from *Hobgood, Judge.* Judgment entered 10 November 1977 in Superior Court, DURHAM County. Heard in the Court of Appeals 22 August 1978.

Defendant was indicted 28 May 1974 for the first degree murder of William O'Neal. The defendant was originally tried on the charge of first degree murder, found guilty of second degree murder, and sentenced. The conviction was affirmed by the Court of Appeals and discretionary review was denied by the Supreme Court. The defendant was subsequently afforded a new trial based upon *Mullaney v. Wilbur,* 421 U.S. 684 (1975), upon his petition for a writ of habeas corpus to the United States District Court, Middle District of North Carolina.

At the second trial, the evidence tended to show: On Saturday evening, 18 May 1974, the deceased, his wife, two daughters and the husband of each, and a friend, E. C. Ray, went to a private club known as the Wagon Wheel. They arrived in two separate cars. At about 1:00 o'clock a.m. the O'Neal party left the club and started toward their cars. The deceased, who was not drunk but who had been drinking, started to get into the back

seat of the car with his wife. His daughter and son-in-law were seated in the front. At approximately the same time, E. C. Ray approached his car and started to unlock the door. Their cars were parked about 150 feet apart.

Before either O'Neal or Ray had entered his car, another car was driven into the parking lot. The automobile was stopped near the O'Neal car and faced in the opposite direction. The passenger side of the other car faced the passenger side of O'Neal's car. The two cars were approximately the width of a car or car and one-half apart. The defendant, James Alton "Buck" Grady, was sitting in the front passenger seat of the other car. The defendant began cursing at the deceased. The deceased told defendant Grady not to use such language because his wife and daughter were with him. The decedent started walking towards the defendant's car. As he approached the car, more words were exchanged, and the defendant cracked open the car door. The decedent, while holding his hands in front of him, started stepping backwards. The defendant then shot the decedent.

The defendant testified that before his car stopped O'Neal had asked, without provocation, if defendant was looking for trouble. He testified that as his brother tried to drive off, O'Neal slapped him through the open window, opened the door, and tried to pull him out of the car by his pants leg. The defendant testified that during the struggle he came up with the gun, which was stored between the front seats, without being conscious of what he was doing. He testified that before he knew what was happening, the gun went off, and O'Neal grabbed himself and staggered backwards.

After the shot was fired, E. C. Ray, before ever entering his car, ran over to Buck Grady's car. There he found the decedent staggering from his wound and the defendant standing outside the car holding a gun. A struggle between E. C. Ray and the defendant ensued. By this time William Grady, the defendant's brother and driver of the car, had climbed out of the car on the opposite side. Ray took the gun from the defendant and shots were exchanged between Ray and William Grady.

E. C. Ray was shot twice—once in each shoulder with a .22 caliber bullet. The defendant was shot once in the back and his brother once in the arm.

State's Exhibit No. 5, a Rohm, RG-10 .22 caliber revolver, was found in the Grady car. State's Exhibit No. 8 is the lead slug removed from the shoulder of E. C. Ray. According to the ballistics expert, this .22 caliber bullet was fired from State's Exhibit No. 5. The defendant's weapon, State's Exhibit No. 3, was identified as a Rohm caliber .38 special revolver. State's Exhibit No. 7 is a .38 caliber lead slug which was removed from defendant's back. The State's ballistics expert testified that in his opinion the bullet was fired from State's Exhibit No. 3, the defendant's gun. The defendant's gun imparted eight lands and grooves with a right twist. These same marks appeared on the bullet removed from defendant's back.

The evidence showed that in a prior trial E. C. Ray denied having a gun the night of the incident. Ray admitted at this trial that he had a .38 Colt in his car the night of the incident. The gun was never tested by the S.B.I. laboratory to determine if it had fired the bullet found in the defendant. The ballistics expert testified that a Colt .38 special has six lands and grooves with a left twist. A Colt Trooper Mark III has six lands and grooves with a right twist. In his opinion State's Exhibit No. 7 could not have been fired from any Colt caliber .38 weapon. The State's Exhibit No. 7 was lost before this trial.

Evidence showed the decedent's right arm had been paralyzed from the elbow down. He could not open his fingers on the right hand and was able to move the whole arm only from the shoulder. The paralysis was the result of an injury which caused the complete loss of the medial and ulna nerves. Also, the main artery serving the arm and fingers was severed, and only ancillary blood supplies from the upper arm prevented the gangrenous process in the arm. The injury to the decedent had occurred in March of 1950.

*Attorney General Edmisten, by Assistant Attorney General Richard L. Griffin, for the State.*

*Murdock and Jarvis, by Jerry L. Jarvis, for defendant appellant.*

MORRIS, Judge.

The defendant has brought forward three assignments of error. He first contends that the manner of the investigation essen-

tially constituted a suppression of evidence favorable to the defendant and resulted in a denial of due process.

[1] The defendant's first argument is that he was denied due process when E. C. Ray was allowed to testify for the State *at the first trial*, contrary to true facts known to a detective and the district attorney, that he did not have a gun the night of the incident. The defendant argues that such conduct denied the defendant evidence that could have led to the corroboration of his self-defense theory by showing that the defendant was not shot with his own gun but with E. C. Ray's gun.

It is well established that deliberate deception of a court and jurors by the State's presentation of known false evidence violates the "rudimentary demands of justice". *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Furthermore, a conviction secured by false evidence must fall where the State allows false testimony to go uncorrected. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972). Nevertheless, the false testimony, regardless of whether corrected, was at a former trial and did not prejudice the defendant since he was afforded a new trial on other grounds. Furthermore, there was overwhelming, uncontradicted testimony that the decedent had no gun and that the defendant had been wounded in an exchange of fire occurring after E. C. Ray struggled with defendant and took away his gun. Finally, as pointed out below, the State cooperated by running all the tests on the bullet found in the defendant as requested by the defense.

[2] The defendant also argues that the loss of State's Exhibit No. 7 (the bullet removed from the defendant's back) before the second trial denied the defendant a fair opportunity to present evidence in his favor. There is no question but that the State has the duty, within limits, fairly to disclose evidence favorable to the defendant upon motion. *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed. 2d 30 (1977). *See* G.S. 15A-903 and official commentary. The State clearly performed its duty in the present case. Indeed, at the request of defendant's counsel, the State arranged for the removal of the bullet from the defendant's back. Removal of the bullet was not necessary at the time for recovery from defendant's wound. The bullet was sent to the S.B.I. laboratories for identification of its caliber at the request of

defendant's counsel. No further tests were requested by defense counsel and, because of the State's belief that the Ray weapon was not material to this case, the gun itself was not examined or tested. The ballistics expert, who had examined the bullet before it was lost, testified that (1) the identifying marks left on the bullet were compatible with marks left by the type gun belonging to the defendant, and (2) such marks were incompatible with those left by a Colt .38 caliber weapon. In view of the unequivocal and unimpeached testimony of the ballistics expert and the uncontradicted testimony that the decedent had no gun, the defendant has failed to show how the unavailability of the lost bullet denied him material evidence essential to his defense. There was no suppression of evidence by the State.

[3] By his second assignment of error defendant contends that the trial court committed prejudicial error by allowing the ballistics expert to testify that the lost bullet could not have been fired from any Colt .38 caliber weapon. Defendant urges error in that not only was the lost bullet not identified as being a .38 caliber bullet but that also the ballistics expert was allowed to testify that the lost bullet could not have been fired from a Colt .38 caliber weapon which was never introduced into evidence. Defendant's argument has no support in the record or in the law.

A full reading of the testimony of the State's ballistics expert makes it abundantly clear that the lost bullet had been identified as a .38 caliber bullet and that it had been fired from a .38 caliber weapon with rifling of eight lands and grooves with a right twist. Secondly, defendant now argues that any testimony that the lost bullet could not have been fired from the Colt .38 should have been excluded since the weapon was neither examined by the expert nor produced at trial.

The caliber of the bullet examined by the expert was within his personal knowledge. The fact that E. C. Ray's gun was a Colt .38 is supported by the evidence and was properly included in a hypothetical question submitted to the witness. See 1 Stansbury, N.C. Evidence, § 136 (Brandis Revision 1973). In response to a hypothetical question, the witness expressed his opinion that State's Exhibit No. 7 (the lost bullet) was not fired by a Colt .38 caliber weapon. North Carolina has recognized the competency of ballistics experts to express opinions on the caliber and the

source of bullets. *State v. DeMai*, 227 N.C. 657, 44 S.E. 2d 218 (1947). The expert's testimony clearly demonstrated that he was familiar with the characteristics of Colt .38 caliber weapons. In response to a properly phrased hypothetical question, fairly supported by the evidence, the expert witness expressed an opinion based on knowledge well within his sphere of expertise. There was no error in allowing the opinion into evidence.

[4] Finally, defendant asserts that the trial court erred in allowing Dr. Woodhall's testimony on the condition of the decedent's arm at the time of the incident. The doctor's testimony was based on his treatment of the decedent in 1950 and his prognosis of the extent of permanent disability suffered by O'Neal as a result of the injury suffered in 1950. Dr. Woodhall, a stipulated expert in the field of neurosurgery, testified to the extent of the injuries from his own personal knowledge. The injuries included the complete loss of the nerves which control the grasping of the fingers, the pulling-in of the wrist, and elevating of the hand. There was also the loss of the main blood supply to the arm. Based upon his testimony on the permanent nature of the injury to O'Neal and considering the lay testimony on O'Neal's physical condition at the time of the incident, the medical expert's opinion on O'Neal's ability to open a car door or to strike someone with his right hand was competent. *Cf. Jones v. Shaffer*, 252 N.C. 368, 114 S.E. 2d 105 (1960) (physician diagnosing permanent disability allowed to express opinion on patient's ability to perform certain work); *see e.g.*, 1 Stansbury, N.C. Evidence, § 135 (Brandis Revision 1973), and 6 N.C. Index 3d, Evidence, § 44. The lapse of time from the treatment of O'Neal to the time of the incident goes to the weight to be accorded the expert's opinion, not its admissibility. *See e.g.*, 2 Jones on Evidence, 6th Ed., Opinion Testimony, § 14.31 (1972).

The defendant has abandoned his two remaining assignments of error.

No error.

Judges HEDRICK and WEBB concur.